U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 AUG 30  PM 2: 53

CLERK

BY ___ pjl ___
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA          )
                                  )
         v.                       )        Case No. 1:09-cr-64-20
                                  )
NOEL DELAROSA                     )

## OPINION AND ORDER DENYING DEFENDANT'S MOTION
## FOR NEW TRIAL AND ACQUITTAL
(Doc. 1019)

This case comes to the court on Defendant Noel Delarosa's motion for a new trial and acquittal.  (Doc. 1019.)  The court held an evidentiary hearing on the motions on July 24, 2012 in which it heard testimony from Defendant, his former defense counsel Donald Kinsella, Esq., Luis Rivas, and Zachary Grant.  As part of the parties' filings, the court considered a number of affidavits and reports submitted by the government, as well as fifteen proffer statements and various documents submitted by Defendant.

Defendant's arguments in favor of a new trial are twofold.  First, he argues that Attorney Kinsella provided constitutionally ineffective assistance at trial.  Second, he argues that there is newly discovered evidence that calls into question the veracity of certain witnesses' testimony.  Defendant also moves for a judgment of acquittal, arguing that the evidence against him at trial was insufficient to support the verdict.  The government opposes both motions.

The government is represented by AUSA Craig Nolan.  Defendant is represented by Mark Keller, Esq.[1]

---

[1] Post-trial, the court granted Defendant's motion for new counsel, finding that the attorney-client relationship between Defendant and Attorney Kinsella had broken down and they could no longer effectively communicate.  In granting the motion, the court did not find that Attorney Kinsella's representation was deficient.

# I.    Factual Background.

The court assumes the parties' familiarity with the underlying facts and thus only summarizes the evidence at trial before it analyzes Defendant's claims.

On May 17, 2011, a jury in the District of Vermont found Defendant Noel Delarosa and co-defendant Daniel Lugo guilty of conspiring to distribute 5000 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 846. The jury found Defendant Delarosa (but not Defendant Lugo) guilty of conspiring to distribute 100 kilograms or more of marijuana, the second object of the charged conspiracy. This outcome reflected the evidence at trial that while Defendant Delarosa oversaw all aspects of the conspiracy, Defendant Lugo's involvement was limited to the conspiracy's cocaine distribution.

The evidence at trial was presented over several weeks and included testimony from forty-six witnesses, as well as evidence of controlled purchases, seized contraband, cell phone and financial records, travel records and car rental agreements documenting the conspiracy's drug runs, and vehicle records indicating which vehicles were used in the conspiracy, their owners, and how the vehicles had been purchased.

The evidence against both Defendants Delarosa and Lugo was overwhelming with witness after witness testifying to the manner in which the Schenectady-based conspiracy operated, what roles were played by the various participants, how narcotics were obtained, and the manner in which additives were used to "stretch" the cocaine supply which was later "bricked" with a compression device to make it appear as if it had not been cut. Numerous witnesses, including the drug couriers themselves, testified how, at Defendant Delarosa's direction, cocaine and marijuana were transported to Rutland, Vermont where they were distributed by two overlapping Vermont drug conspiracies, the "Brooker organization" and the "Morrison organization." Members of the Brooker organization identified both Defendant Delarosa and Defendant Lugo and described in detail the drug deliveries they received from them and their associates and how payment was made. Defendant was known to the Vermont based co-conspirators by his street names of "Green Eyes," "Green," and "A-Rod."

2

The trial witnesses included members of Defendant Delarosa's trusted inner circle based out of his Schenectady, New York clothing store/barber shop "Fly-to-the-Limit," many of whom were testifying pursuant to cooperation agreements with the government, a fact that was disclosed to the jury. Although minor inconsistencies between the testimony of various witnesses were revealed, the witnesses generally testified in a consistent and corroborated manner.

In the course of the trial, it was revealed that Defendant Delarosa, himself, had worked as an informant for the federal government in New York and had done so while engaged in drug trafficking. It was also revealed that Defendant's status as a DEA informant was known to some members of his inner circle.

Attorney Donald Kinsella represented Defendant Delarosa from indictment through trial. He provided the government's voluminous discovery to Defendant who had an opportunity to review it, summarize it, make notes, and suggest strategies and questions to Attorney Kinsella. In the course of their relationship, Attorney Kinsella consulted frequently with Defendant who sought and obtained a meaningful role in conducting his own defense.

After the first few days of trial, the government dismissed the charges against Defendant Lamar Johnson and reached a plea agreement with Defendant Evelio Baro. In the course of the trial, the government offered plea agreements to both Defendant Delarosa and Defendant Lugo. Attorney Kinsella advised Defendant to accept the offer so that he could spend less time in federal prison and avoid triggering a mandatory minimum. Defendant rejected this advice. Defendant proffers that if Defendant Lugo's attorney, Brooks McArthur, Esq., were called to testify, he could confirm that, in the course of a heated conversation regarding the plea deal and other issues, Attorney Kinsella told Defendant that he "didn't give a f**k about him."

Attorney Kinsella describes his defense strategy as seeking to establish that the government would be unable to meet its burden of proof because there existed multiple conspiracies and because the charged drug quantities could not be established. He also sought to establish that because many of the government's witnesses were testifying

pursuant to cooperation agreements, they had an incentive to testify in a manner consistent with the government's goal of securing a guilty verdict.

Defendant asserts that his own defense strategy would have been to explore every inconsistency in the evidence, call witnesses who could demonstrate that the government's investigative conduct was improper, fully disclose Defendant's role in the offense, and demonstrate that the agents who led the investigation sought retribution against Defendant for engaging in drug dealing while acting as a government informant and for allegedly tipping off John Brooker that indictments would soon be handed down.[2] Defendant would also have placed greater emphasis on the fact that some of the cooperating witnesses believed Defendant had "set them up" and thus had an additional motive for testifying untruthfully against him. Defendant urges the court to find that Attorney Kinsella provided ineffective assistance of counsel at trial for failure to adequately pursue this trial strategy.

In seeking a new trial, Defendant cites newly discovered evidence consisting of an allegedly recorded conversation between one of the witnesses, Luis Rivas, and Defendant's wife in which Mr. Rivas stated that he perjured himself at trial in response to the government's threats and instructions regarding the manner in which he was required to testify. Defendant further proffers that if Defendant's father were called to testify, he would confirm that Mr. Rivas called him to apologize for testifying against Defendant at trial and stated that he was forced to do so by the government. He would also confirm that Mr. Rivas said he had been told by the Vermont agents that Defendant was an informant and set him up.

At the court's hearing, Mr. Rivas testified that when he was released from incarceration, he met with Defendant's wife to obtain some jewelry that she was holding

---

[2] Defendant contends the government erroneously believed that the New York agents had disclosed the forthcoming Vermont indictments to Defendant who, in turn, had tipped off John Brooker—a claim Defendant denies. Defendant asserts that the government's erroneous belief that he was the source of Mr. Brooker's information angered the Vermont agents and allegedly motivated them to ignore other sources of supply and to focus exclusively on Defendant. This also motivated them to disclose to cooperating witnesses that Defendant "was a rat."

4

for him. In order to induce her to give him the jewelry (which she ultimately claimed to have left at home), Mr. Rivas "told her what she wanted to hear" in the hopes that she would comply with his requests for the return of his property. At the court's hearing, Mr. Rivas affirmed under oath that he was not threatened by the government, was not told how to testify, and in fact testified truthfully at trial. He acknowledges that he suspects that Defendant may have "set him up" but testified that he has done his time and is moving on with his life rather than pursuing retribution against Defendant.

As further newly discovered evidence, Defendant points to evidence that codefendant Zachary Grant, who identified Defendant at trial, was unable to identify Defendant, post-trial, when they were incarcerated together. Defendant proffered that if called to testify, Zay Ray, an employee at Marble Valley Correctional Center, would confirm that Mr. Grant was present in that facility at the same time as Defendant, worked out and ate next to Defendant, and showed no signs of recognizing him.

Zachary Grant also testified at the court's hearing and acknowledged that he had been incarcerated with Defendant Delarosa post-trial. He testified that he had deliberately displayed no sign that he recognized Defendant because he sought to avoid any further interaction with him.

By letter dated August 16, 2012, Defendant advised the court that he would not offer an expert opinion in support of his claim that he received ineffective assistance of counsel at trial.

## II. Conclusions of Law and Analysis.

### A. Defendant's Motion for New Trial.

Fed. R. Crim. P. 33(a) provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." With regard to a "Rule 33 motion to vacate, '[t]he ultimate test is whether letting a guilty verdict stand would be a manifest injustice.'" *United States v. Snype*, 441 F.3d 119, 140 (2d Cir. 2006) (quoting *United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005) (internal quotation marks omitted)). A new trial is not warranted if the court is "satisfied that competent, satisfactory and sufficient evidence in th[e] record supports the jury's

finding that this defendant is guilty beyond a reasonable doubt[.]" *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992). "In making this assessment, the judge must examine the totality of the case. All the facts and circumstances must be taken into account," and there "must be a real concern that an innocent person may have been convicted" before the "interest of justice" requires a new trial. *Id.* The Second Circuit has observed that the granting of a Rule 33 motion "[is] disfavored in this Circuit." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).

As noted previously, Defendant cites two grounds for a new trial: (1) ineffective assistance of counsel; and (2) newly discovered evidence. The court examines these claims separately, but also considers whether together they would give rise to manifest injustice if the guilty verdict is permitted to stand.

### 1. Ineffective Assistance of Counsel.

The court considers first whether it should address Defendant's ineffective assistance of counsel claim as a ground for a new trial or leave that claim for appellate review. In *United States v. Brown*, 623 F.3d 104 (2d Cir. 2010), the Second Circuit held "[a]s a matter of first impression, . . . that when a claim of ineffective assistance of counsel is first raised in the district court prior to the judgment of conviction, the district court may, and at times should, consider the claim at that point in the proceeding." *Id.* at 113. The court observed that "district courts face competing considerations in deciding whether it is appropriate to inquire into the merits of such claims prior to judgment, including principally the potential disruption of the proceedings, especially if the attorney against whom the complaint is directed continues at the time to represent the defendant." *Id.*

Here, although Defendant Delarosa has not yet been sentenced and thus judgment has not been rendered, no competing considerations exist because the court has appointed substitute counsel for him. Accordingly, the court may evaluate Defendant's claim free from concern that it will disrupt the proceedings or impair the attorney-client relationship. In addition, the court notes that it has had a lengthy opportunity to observe Attorney Kinsella's performance before, during, and after trial, as well as the interaction

between Attorney Kinsella and Defendant. The trial court may thus possess a unique perspective which may be difficult to replicate at the appellate level by examining only the transcripts of the various proceedings.

To prevail on an ineffective assistance claim, a defendant must satisfy the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The *Strickland* test requires a defendant to establish both (1) that defense counsel's actions or omissions fell below an objective standard of reasonableness; and (2) that there exists a reasonable probability that but for counsel's unprofessional errors, the result of his case would have been different. *Strickland*, 466 U.S. at 688, 694.

To satisfy the first prong of *Strickland*, a defendant must establish "on the basis of the facts of the particular case 'viewed as of the time of counsel's conduct'" without the benefit of hindsight that his counsel's performance fell beneath a standard of objective reasonableness. *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 690). To sustain this burden, a defendant must do more than point to "risky, unorthodox or downright ill-advised" trial strategy or tactics. *Tippins v. Walker*, 77 F.3d 682, 686 (2d Cir. 1996). The court is required to grant trial counsel "'wide latitude' in making tactical decisions,'" *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (citation omitted), and must grant a new trial only when "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable[.]'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

To satisfy the second prong of *Strickland*, the defendant must show actual prejudice, that is "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* However, "the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." *Id.* at 695. If the evidence of a defendant's guilt is strong, the second prong of the *Strickland* test is not easily satisfied as it is less likely that trial counsel's performance materially affected the outcome. *See*

*Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991); *Wise v. Smith*, 735 F.2d 735, 739 (2d Cir. 1984).

Where trial counsel refuses to pursue a defendant's preferred trial strategy, a defendant must present an "alternative trial strategy which would allow [the court] to conclude that his counsel's chosen strategy was objectively unreasonable or caused him prejudice." *United States v. Eugenio*, 33 Fed. App'x 3, 5 (2d Cir. 2002).

Defendant cites the following alleged deficiencies in Attorney Kinsella's performance.

### a. Motion to Dismiss Based on Outrageous Government Conduct.

Defendant states that he asked Attorney Kinsella to file a pre-trial motion to dismiss the indictment for outrageous government conduct but Attorney Kinsella failed to do so. Attorney Kinsella testified that the reason why he did not file the motion is because he determined that it would not be successful.

In the course of the trial, Attorney Kinsella raised Defendant's concerns regarding the government's conduct with the court, noting that Defendant's wife had filed "basically a *Bivens* action" (Tr. 5/13/11 at 49) against the prosecutor AUSA Craig Nolan and the government agents. Attorney Kinsella further observed that "there have been concerns on the part of Mr. Delarosa and his wife about the conduct of the investigation and the conduct of the agents." (Tr. 5/13/11 at 50.) He noted that although he did not personally believe there had been improper behavior by the prosecutor or the agents, "Mr. Delarosa takes a different view of the situation in his general view of the corruption in the system[,]. . . [and] [h]e would like to address the Court with his concerns at this point." (Tr. 5/13/11 at 51.)

After consulting with the attorneys, the court allowed Defendant to place his concerns on the record. Defendant described his concerns at length as follows: (1) law enforcement agents disclosed his status as a confidential informant in the course of their investigation; (2) an audio CD which documents the activities of a confidential informant ("CI-81") on January 23, 2009 which allegedly contradicts ATF Special Agent Thomas

8

Jusianiec's affidavit and grand jury testimony about the transaction; [3] (3) Agent Jusianiec photographed Defendant's truck in his father's driveway and seized it without the proper paperwork. In response, AUSA Nolan allegedly stated that he did not authorize the seizure and was distancing himself from Agent Jusianiec; [4] (4) Agent Jusianiec advised Defendant's wife that Defendant was having an affair and was expecting a baby with another woman; (5) Agent Jusianiec entered Defendant's store with other officers posing as code enforcement officers and thereafter measured the building and took photos; (6) Agent Jusianiec advised Julio Martinez that he was looking for Gabriel Martinez without initially identifying himself as a law enforcement officer and then grabbed a telephone out of Julio Martinez's hand to see if he was talking to his brother; and (7) Defendant's father's information that when witness Keith Canteen was handed a subpoena, Agent Jusianiec threatened and coerced him, and told him what to say on the stand to which Mr. Canteen allegedly responded that he wanted to speak to Defendant's attorney. (Tr. 5/13/11 at 54-60.) Defendant summarized his concerns as follows: "I just feel that if they . . . are going to try to enforce the law you have to abide by the law." (Tr. 5/13/11 at 61.) He acknowledged that "most" of his concerns were also addressed in his wife's civil lawsuit against the government agents. *Id.*

Defendant asserts that if Attorney Kinsella pursued an outrageous government conduct defense as proposed by Defendant, Carlos Ruiz (who would testify to the code enforcement officers ruse); his wife Lizamaris Delarosa (who would testify to the agents'

---

[3] The government acknowledges that the January 23, 2009 recording inadvertently discloses an interaction between the investigating agents and CI-81. Defendant claims that not only does the recording demonstrate that CI-81 had not been properly searched and surveilled during the transaction in question but it contradicts the testimony of ATF Special Agent Jusianiec that the agents searched CI-81 multiple times when in fact the recording reveals CI-81 had a brass knuckle knife. Neither Agent Jusianiec's affidavit nor his grand jury testimony represents that the agents searched CI-81 for weapons and found none. He stated only that no contraband was found. Defendant was not the target of the January 23, 2009 controlled transaction and, in fact, has no involvement in it. Prior to trial, the court ruled that the entire tape could be played for the jury. The government opted not to use it as evidence or to call CI-81 to testify.

[4] The court notes that this is Defendant's interpretation of AUSA Nolan's statements and not what he actually said.

alleged harassment); and his father Fernando Delarosa (who would confirm that the Vermont agents told Luis Rivas that Defendant was an informant and had set him up and who heard Keith Canteen complain of government threats when he was subpoenaed) could have been called as witnesses to support his claims.

"[T]o obtain dismissal of an indictment based upon a claim of outrageous governmental conduct, a defendant must establish that the government engaged in outrageous behavior in connection with the alleged criminal events and that due process considerations bar the government from prosecuting" him as a result. *United States v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991). To warrant dismissal of an indictment, "the governmental conduct" must be "so offensive that it shocks the conscience." *United States v. Chin*, 934 F.2d 393, 398 (2d Cir. 1991) (quotation omitted). "Ordinarily [the] official misconduct must involve either coercion, or violation of the defendant's person. Absent such extreme misconduct, relief in the form of reversal of a conviction is rare." *United States v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997) (internal citations omitted).

Here, Defendant falls far short of identifying governmental misconduct that shocks the conscience. Although he identifies a number of instances in which he contends the government agents should have conducted themselves more professionally, none of the actions in question tainted the evidence actually presented at trial, falsely informed witnesses of Defendant's status, or appear to have violated Defendant's constitutional rights. As for claims that Keith Canteen was threatened by government agents, Mr. Canteen testified at trial and made no such claim. Had Attorney Kinsella filed a motion to dismiss the indictment on the basis of outrageous government conduct, it would have been denied. The court finds no evidence of ineffective assistance of counsel in his failure to do so.

**b. Motion to Suppress Defendant's Statements.**

Defendant argues that Attorney Kinsella should have also filed a motion to suppress statements he made pre-trial to law enforcement agents. Defendant argues that he was subjected to custodial interrogation by law enforcement agents when they engaged in a conversation with him at his store without giving him *Miranda* warnings.

On January 14, 2010, at approximately 9:15 a.m., law enforcement agents were searching in Schenectady for Defendant Lugo, who had been indicted and for whom they had an arrest warrant. The agents went to Defendant Delarosa's Fly-to-the-Limit store, where Defendant Lugo (who is Defendant's cousin) worked the night shift. There they found Defendant Delarosa but not Defendant Lugo. They informed Defendant Delarosa of the purpose of their visit and he asked whether he, too, had been indicted. The agents told him that he had not, although they anticipated he would be charged.

The Vermont agents, Special Agent Thomas McCoy and Agent Jusianiec, asked to speak to Defendant in private. They entered the barber shop portion of the store and spoke with the door closed for approximately one half hour. Two government agents remained in the front of the store. There is no evidence that the store was closed to the public during the time in question. Defendant questioned the Vermont agents about their investigation and told them that "he had a lot of respect for the Feds and that he knew how the system worked and that if he wasn't under indictment that there was still an opportunity that he could help himself out." (Tr. 5/12/11 at 191.) He mentioned that he had heard about the arrests in Rutland[5] and the investigation of Julian Datil-Rodriguez, whom he offered to set-up. He noted that he used to supply drugs in Rutland but that he had quit some time ago. He later stated that he not been back to Vermont since he started cooperating with the Albany office of the DEA in 2007. He mentioned that he knew John Brooker and supplied clothing for Mr. Brooker's store. He repeatedly offered to cooperate and acknowledge that he knew he had "f**ked up." (Tr. 5/12/11 at 193.) He also offered to assist in convincing Defendant Lugo to self-surrender. The following day, Defendant called the agents and arranged a meeting, at which he delivered Defendant Lugo to the agents.

Defendant was not placed under arrest either before, during, or at the conclusion of his conversation with the agents. He was not handcuffed or physically restrained in any way. He points to no shows of force, threats, deceit, or trickery that induced him to

---

[5] Members of the Brooker and Morrison organizations were arrested before members of Defendant's organization.

speak with the agents. Rather, he did so voluntarily in an effort to obtain benefits for himself in what appeared to be an investigation that was likely to lead to charges against him. The conversation occurred in a public place during regular business hours and was relatively brief in nature. Defendant never asked to terminate the conversation, take a break, or consult with an attorney. He asked questions in addition to answering them, and used the opportunity to determine when he could expect an indictment and whether he could avoid going to jail by cooperating.

Most courts, including this one, have held that a criminal defendant bears the burden of establishing that he or she was subjected to custodial interrogation.[6] The question "whether a suspect is 'in custody' is an objective inquiry." *J.D.B. v. North Carolina*, 131 S. Ct. 2394, 2402 (2011). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The Second Circuit has held that "[t]he free-to-leave inquiry constitutes a necessary, but not determinative, first step in establishing *Miranda* custody" and "[t]he ultimate inquiry for determining *Miranda* custody . . . is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal

---

[6] *See United States v. Artis*, 2010 WL 3767723, at *4 (D. Vt. Sept. 16, 2010) ("The weight of authority appears to hold that a defendant bears the burden of establishing that he or she was subjected to custodial interrogation in order to establish a constitutional violation as the basis for suppression of evidence."); *see also United States v. Davis*, 792 F.2d 1299, 1308 (5th Cir. 1986) (noting that defendant "had the burden of proving that he was under arrest or in custody" when seeking to suppress statements); *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989) (affirming district court's dismissal of defendant's *Miranda* claim because defendant "failed to demonstrate that he was subjected to custodial interrogation"); *United States v. Shteyman*, 2011 WL 2006291, at *14 (E.D.N.Y. May 23, 2011) ("The Court notes that on a motion to suppress statements, it is the defendant who bears the burden of demonstrating that he was subject to custodial interrogation."); *United States v. Sciolino*, 2009 WL 2914570, at *3 (E.D. Cal. Sept. 9, 2009) ("The Fifth Circuit, Eighth Circuit, and numerous district courts have also explicitly held that a defendant bears the burden of proving he was in custody at the time incriminating statements were made.") (collecting cases).

arrest." *United States v. Newton*, 369 F.3d 659, 670 (2d Cir. 2004) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (internal quotations omitted)).

Here, there is no evidence that Defendant was not free to leave or to refuse to engage in a conversation with the Vermont agents. There was also neither a formal arrest nor a restraint on Defendant's freedom of movement commensurate with an arrest. As a result, Defendant would have been unable to sustain his burden of demonstrating that he was in custody at the time of the conversation and that he was entitled to *Miranda* warnings. Accordingly, a motion to suppress would have been futile. The court finds no evidence of ineffective assistance of counsel in Attorney Kinsella's failure to file a motion to suppress.

### c. Alleged Failure to Adequately Cross-Examine and Call Witnesses.

Defendant claims that Attorney Kinsella failed to adequately cross-examine the government's witnesses at trial and failed to call additional witnesses. "[T]he conduct of examination and cross-examination is entrusted to the judgment of the lawyer, and an appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir.1998) (per curiam); *see also United States v. Eisen*, 974 F.2d 246, 265 (2d Cir.1992) (no ineffective assistance despite defendant's claim that lawyer had failed to thoroughly impeach prosecution witnesses, because decisions as to nature and extent of cross-examination are strategic). "A failure to call a witness for tactical reasons of trial strategy does not satisfy the standard for ineffective assistance of counsel." *United States v. Eyman*, 313 F.3d 741, 753 (2d Cir. 2002). It is against this backdrop that the court must analyze Defendant's remaining proffer statements.

### 1. Agents Jusianiec and McCoy.

Defendant contends that, if properly cross-examined, Agents Jusianiec and McCoy could have established that Graytz Morrison and John Brooker were rivals in the distribution of illegal narcotics in Rutland and had numerous other sources of drugs in Vermont, Pennsylvania, and New York. They could also corroborate that Mr. Brooker had advance notice that he would be indicted.

The agents would have confirmed that when Thomas Luzader was describing "Green Eyes" at trial, he was actually describing Evelio Baro who was present with Defendant in the courtroom during this testimony. In addition, they could have revealed that New York agents disclosed to New York witnesses Defendant's status as a confidential informant and that witness Antoine Mathis lied when he advised the agents that he knew nothing about guns. They could also point out that Hermann Robinson had threatened to involve Jamie Sangiacomo-Jackson in the case if she did not sell one the vehicles used by the conspiracy.[7]

Finally, Defendant asserts that the Vermont agents could have been forced to explain that, on January 23, 2009, they failed to maintain complete audio and visual surveillance over CI-81 who was allowed to carry a knife during his transactions--a fact that the agents failed to disclose in their reports, affidavits, and grand jury testimony.

As the government points out, after more than two years of surveillance and investigation, both Agents McCoy and Jusianiec could offer significantly damaging testimony against Defendant with very little countervailing testimony that would be helpful to his defense. The government nonetheless chose to present its case through Defendant's co-conspirators rather than primarily through law enforcement witnesses. To that end, the government called Agent McCoy solely for the purposes of relating the statements Defendant made to the agents when they came to his store in search of Defendant Lugo. The government did not call Agent Jusianiec. The credibility of the

---

[7] The government called Ms. Sangiacomo-Jackson who testified that Defendant is the father of her then-seven-month-old child. (Tr. 5/10/11 at 52.) She described the relationship she shared with Defendant and the co-conspirators she met, including Hermann Robinson, Daniel Lugo and Leroy Rice. She further testified about registering in her name, at Hermann Robinson's request, a gray Oldsmobile Intrigue which had been previously registered to Defendant Lugo and which several witnesses testified was used to transport Defendant's narcotics. (Tr. 5/10/11 at 60-61.) She explained that Mr. Robinson told her to report the car as stolen. She testified that Defendant confirmed the existence of an investigation. (Tr. 5/10/11 at 64-65.) Ms. Sangiacomo-Jackson also testified about her less than positive interactions with Mr. Robinson, but did not mention any threats. (Tr. 5/10/11 at 58-60.) Had she done so, it would not have materially altered her testimony.

Vermont officers and the appropriateness of their behavior was thus not critical to the government's case.

Defendant Lugo called Agent Jusianiec in the defense's case. Agent Kinsella advised the court in advance that Defendant wanted to pursue a line of questioning with Agent Jusianiec with which he disagreed. Attorney Kinsella pointed out that he believed the questions Defendant sought to ask would not be permitted by the court and "would be harmful to Mr. Delarosa's interest in this case." (Tr. 5/16/11 at 5.) The court noted that it could not "forecast a ruling" without hearing the questions but noted that if they pertained to Defendant's concerns regarding outrageous government conduct which had previously placed on the record, the court "was not confident that the issues raised had a direct impact on what had been presented by the government." *Id.*

Agent Jusianiec testified that although Mr. Brooker did not have "multiple sources for narcotics" "he definitely had a few sources." (Tr. 5/16/11 at 26.) Attorney Kinsella elicited that one of those sources was in Philadelphia. Through further defense questioning, Agent Jusianiec identified other sources in Hudson, New York, and New York City. Defense counsel's examination of Agent Jusianiec was brief and focused primarily on the Rutland conspiracies' other sources of supply.

In this case, there was little, if any, incentive for Defendant to have government agents testify at length against him or to "open the door" to such testimony by cross-examining the agents on a variety of unrelated topics. Had Defendant pursued this approach, the agents' testimony would have presumably demonstrated the enormous government resources that had been dedicated to eradicating a notorious drug dealing operation from the jurors' communities for which Defendant had been a major supplier. It would have also demonstrated to the jury that the evidence presented by the government was the "tip of the iceberg" and that there were hundreds of hours of surveillance documenting a near constant Rutland drug distribution business. Defense counsel elicited from the Vermont agents the only testimony that was demonstrably helpful to the defense—the Rutland drug dealers had other sources of supply. The remaining testimony Defendant would have elicited was either cumulative, collateral, or

actually harmful to the defense. The court finds no ineffective assistance of counsel in the failure to cross-examine Agents McCoy and Jusianiec in the manner proposed by Defendant.

### 2. Lizamaris Delarosa.

Defendant further argues that Attorney Kinsella should have called Defendant's wife, Lizamaris Delarosa, to testify on a number of subjects. First, she could testify that she had never seen Defendant with a gun on his person, vehicle, or in the house in which they lived. She could have also testified to an incident involving Defendant and Evelio Baro which would have revealed that Mr. Baro and Brian Domingo had hidden a firearm in Defendant's basement. Ms. Delarosa would testify that her husband was angry about this and tried to hit Mr. Baro with his hand but missed. The purpose of this testimony would be to demonstrate that Defendant had no involvement in firearms, did not point a gun at Mr. Baro, and that trial testimony regarding that event was false. Mrs. Delarosa could have also testified that she had never seen Defendant with drugs and did not know he was involved in selling drugs. She would have testified that the agents harassed, disrespected, and attempted to illegally question her.

Somewhat at odds with her alleged lack of knowledge regarding Defendant's involvement with drugs, Defendant would have called his wife to corroborate his status as a confidential informant for the DEA who took a trip to Vermont for this purpose. Mrs. Delarosa would also reveal that she received death threats when Defendant's confidential informant status was disclosed and was not allowed to go to Defendant's store because a "hit" had been ordered on Defendant.

If called to testify, Lizamaris Delarosa could have confirmed that Defendant made ample money from his clothing stores and that his connection to John Brooker was for the purposes of selling clothing not drugs. She could also confirm the legitimate source of the money used to purchase various vehicles. Finally, she would confirm the problems between Defendant and Attorney Kinsella and would testify that she gave information or sought to give information to Attorney Kinsella which he either ignored or refused.

Had Attorney Kinsella called Defendant's wife to testify as proposed, she would have waived the husband-wife privilege with regard to numerous subject matters and "opened the door" to allow the government to cross-examine her with the intent of establishing the following: (1) Defendant's connection to individuals who used firearms and to individuals who were dangerous and made death threats (atypical connections for someone who sold only clothing); (2) the source of Defendant's finances demonstrating that he did not need to engage in drug dealing to support his family and thus may have been motivated solely by greed; (3) Defendant's status as a confidential informant for the DEA coupled with an inference that his value to the DEA was his ongoing connections to the drug world (including in Vermont) and his willingness to cooperate against his friends, acquaintances, and associates; (4) Defendant's relationship with John Brooker— a known Rutland drug dealer; and (5) Defendant's wife's knowledge of Defendant's activities, thus depriving her of any "innocent spouse" defense to forfeiture and other mechanisms to seize the couple's assets. In effect, if called by Attorney Kinsella to testify in favor of Defendant, Mrs. Delarosa would be subjecting herself to government cross-examination that would produce evidence against her own husband and evidence contrary to her own interests. The allegedly favorable testimony she could have provided would have thus come at an extraordinary price. It was well within a reasonable defense strategy not to call her as a witness. As for her efforts to provide Attorney Kinsella with suggestions regarding a defense strategy, Attorney Kinsella was not required to accept or use these suggestions in Defendant's defense because he was consulting directly with Defendant on a frequent basis. The court finds no evidence of ineffective assistance of counsel in Attorney Kinsella's failure to call Lizamaris Delarosa as a witness.

### 3. Luz Vega, Cassandra Delarosa, and Gabriel Angel Martinez.

Defendant argues that Attorney Kinsella should have called Luz Vega, who is co-conspirator Brian Domingo's girlfriend. Ms. Luz could testify that she was unaware that the trip to Arizona with Mr. Domingo and Defendant Lugo was drug related and that she had no knowledge of Defendant and her boyfriend conducting business relating to drugs. She could also confirm the report of a firearm hidden in Defendant's basement by Evelio

Baro having heard the story from Mr. Domingo. She could verify that Mr. Domingo is a five star general "Bounty Hunter Blood" and that the Vermont agents disclosed Defendant's status as an informant to Mr. Domingo. She would also corroborate that it was Mr. Domingo who ordered the "hit" on Defendant.

Much of what Ms. Vega would purportedly offer as testimony is inadmissible hearsay. Although she may have been called to impeach the testimony of Brian Domingo, she would have simultaneously confirmed Defendant's involvement with dangerous people, the drug run to Arizona, and Defendant's status as a DEA informant. The impeachment value of her testimony would have thus been counterbalanced by her corroboration of key points of the government's case. The court finds no ineffective assistance of counsel in the failure to call Ms. Vega as a witness.

Defendant also faults Attorney Kinsella for not calling Defendant's sister, Cassandra Delarosa, who was Evelio Baro's girlfriend during the relevant time period. Based on what Mr. Baro told her, Cassandra Delarosa could testify that Mr. Baro hid a gun in Defendant's basement and thereafter got into a dispute with Defendant about the gun in which Defendant tried to hit Mr. Baro with his hand but missed. As the trial did not involve firearm charges, this may have drawn the jurors' attention to the presence of firearms in the conspiracy.

Cassandra Delarosa would also testify that she never heard Mr. Baro called by the street names attributed to him and that he, rather than Defendant, fit Thomas Luzader's description of "Green Eyes." As Mr. Luzader described "Green Eyes" while both Defendant and Mr. Baro were in the courtroom and thus visible to the jury for comparison, that testimony would have likely been cumulative.

The court finds no evidence of ineffective assistance of counsel in the failure to call Cassandra Delarosa.

Defendant contends that Attorney Kinsella should have called Gabriel Angel Martinez to establish that he traveled to New York City with Leroy Rice and Brian Domingo in Moises Ortiz's black Navigator to the precise location described by Mr. Rice and Mr. Domingo at trial which he would characterize as a joy ride and not a drug run.

Mr. Martinez could further testify that in the almost two years he worked as a barber at Defendant's Fly-to-the-Limit store, he never heard or saw any drug activities. He could also confirm that when he was interviewed by Vermont agents, they told him Defendant was a "piece of sh*t" and a confidential informant for the DEA.

Although Mr. Martinez could testify that he was unaware of any drug dealing, a jury could find that testimony false, or, at a minimum, find that it conflicted with the testimony of numerous witnesses who confirmed that Defendant used the Fly-to-the-Limit store as a base for his drug conspiracy. Rather than find Mr. Martinez credible, a jury might just as easily conclude that Defendant did not trust Mr. Martinez with information regarding his activities. Because there are reasons other than Defendant's innocence that would account for Mr. Martinez's testimony, calling him as a witness would be unlikely to have a significant impact on the evidence other than to corroborate the trip to New York City and to potentially establish the identity of the many co-conspirators who were coming and going from the Fly-to-the-Limit store. The court finds no evidence of ineffective assistance of counsel in the failure to call Mr. Martinez.

### 4. U.S. Probation Officer Michael Patnaude and Agent Mark Maher.

Defendant contends that had Attorney Kinsella called these two government agents, they would have confirmed the circumstances of his January 14, 2009 encounter with law enforcement. They would have also confirmed that the initial purpose of that encounter was to arrest Defendant Lugo, and that Defendant cooperated with the Vermont agents and delivered Defendant Lugo to them.

P.O. Patnaude would further allegedly confirm that Defendant was in Vermont on DEA business, was not a problem during supervision, and had previously expressed a desire to volunteer at schools and other places in order to talk to children and others about drugs, guns, and his experiences in jail. Agent Maher would confirm that he saw Mr. Brooker's vehicle in Schenectady, and knew Attorney Kinsella and was friendly with him.

Assuming arguendo that these government agents would testify in the manner described, their testimony would not exonerate Defendant and would potentially

undermine his claim that the only reason he was in Vermont was to deliver clothing. If Defendant had no Vermont drug connections, there would be no purpose in sending him there on DEA business.

The government claims that neither of the agents would testify in the manner proposed by Defendant and specifically rejects any claim that Defendant was working as an informant in Vermont. As the government points out, Special Agent Ron Arp of the Northern District of New York's DEA office testified at trial and was cross-examined extensively by Attorney Kinsella. During his testimony, Special Agent Arp made clear that the DEA did not permit Delarosa to travel to Vermont as part of his cooperation and that the DEA did not authorize Delarosa to engage in any operations with residents of Rutland. (Tr. 5/10/11 at 89, 95.) According to the government, if called to testify, P.O. Patnaude would confirm that his office approved travel to Vermont by Defendant to self-surrender and that no other travel was authorized. Based upon the foregoing, the court finds no evidence of ineffective assistance of counsel in the failure to call these government agents.

### 5. Nick Lionetti.

Defendant proffers that, if called to testify, Nick Lionetti would identify himself as an assistant manager for Hertz Rent-A-Car and would note that on one occasion, Defendant allowed Evelio Baro to rent a vehicle using Defendant's name and credit provided he "didn't do anything stupid" with the vehicle. Mr. Lionetti could confirm that the rentals had geographic limitations that would not have authorized the travel testified to by the witnesses. Mr. Lionetti would further attest that Defendant rented vehicles in his own name to transport clothing and acted professionally with regard to these rentals.

Evidence of the car rentals themselves was entered into evidence and constitutes the best evidence of which vehicles were rented, by whom, and for which dates. Mr. Lionetti's testimony would not have significantly altered that evidence other than to establish that some of the conspirators may have used the vehicles outside their geographic restrictions. As other witnesses confirmed that Defendant rented vehicles for his clothing business, Mr. Lionetti's testimony on that point would have been merely

cumulative. The court finds no evidence of ineffective assistance of counsel in the failure to call him as a witness.

### 6. Testimony of CI-81.

Defendant contends that Attorney Kinsella should have called CI-81 who could testify that the Brooker and Morrison organizations had several other sources of narcotics in Hudson, Brooklyn, and Poughkeepsie, New York, as well as Philadelphia, Pennsylvania. He could also testify that for eighteen months Schenectady, New York was not a target of the investigation and that he was never asked to travel there to obtain drugs. He could confirm that Julian Datil-Rodriguez was not a target throughout the investigation.

The government produced evidence through Agent Jusianiec's testimony that CI-81 was never present for a delivery of drugs to the Brooker organization. Accordingly, a jury would likely give CI-81's testimony regarding other sources less weight than the testimony of several eyewitnesses who testified that they personally delivered narcotics in specific amounts from Defendant to the Brooker organization.

As for CI-81's testimony regarding the targets of the government's investigation, there is no evidence that the Vermont agents confided in CI-81 to this extent. In any event, as both Defendant and Julian Datil-Rodriguez were indicted, as well as numerous of their co-conspirators from Schenectady, a jury would likely regard with skepticism any claim by CI-81 that these individuals were not targets of the investigation.

As the government points out, had Attorney Kinsella called CI-81 to testify, he would have done so at considerable risk to the defense. CI-81 could testify to a nearly continuous drug distribution business with numerous co-conspirators some of whom either carried or traded in firearms. He could also testify that John Brooker had stopped selling clothing and had turned to the distribution of drugs as his sole occupation, thereby undermining any argument that his connection with Defendant was limited to clothing.[8]

---

[8] Defendant claims that CI-81 would confirm that John Brooker was still selling sneakers from his basement.

21

Because CI-81's testimony was more likely to be harmful than favorable, the court finds no evidence of ineffective assistance of counsel in the failure to call him as a witness.

### d. Alleged Interference in Defendant's Decision to Testify.

Defendant contends that Attorney Kinsella improperly convinced him not to testify in his own defense. At the court's hearing, after waiving his attorney-client privilege, Defendant Delarosa testified that prior to trial he had admitted to Attorney Kinsella that he was trafficking in cocaine during the time alleged in the indictment which was after his 2005 cooperation agreement with the government. He further advised Attorney Kinsella that Daniel Lugo, Keith Canteen, and Luis Rivas all distributed drugs with him but their activities involved only cocaine, not crack or marijuana, and did not include dealing drugs in Rutland. He contends that he "wanted everything to come out" but Attorney Kinsella advised him that his prior felony drug convictions would be used against him, that the jury would hear that he had been "locked up" on a drug charge with his step-son, and that disclosure of his status as a confidential informant who had double-crossed the government by dealing drugs while cooperating would not be in his best interests.

Defendant concedes that the court advised him on the record that the decision whether to testify was his decision and not his attorney's.[9] He provides no evidence that his will was overborne by Attorney Kinsella in making this decision. To the contrary, he

_____

[9] The court gave defense counsel a full day during the trial to consult with their clients. Before doing so, the court addressed Defendants Delarosa and Lugo, stating:

> "I am going to give the defendant[s] an instruction that I would typically give after the motion for judgment of acquittal, but I don't want to forget it because it's an important one. It may not come into play depending on how the Court rules on the motion. And that is about the decision to testify. And it's my job, as the judge, to tell you that that is your decision. That you make it in consultation with your attorneys, but it is your decision and your decision only. And it will be up to you to make that decision."

(Tr. 5/12/11 at 221.) The Second Circuit does not require trial courts to give this advice. *See Brown v. Artuz*, 124 F.3d 73, 79 (2d Cir. 1997) ("We agree with those courts that place no general obligation on the trial court to inform a defendant of the right to testify and ascertain whether the defendant wishes to waive that right.").

admits that he freely challenged Attorney Kinsella's advice and disregarded it when he believed that it was wrong. For example, against Attorney Kinsella's advice, Defendant rejected the government's plea offer during the trial. Contrary to his attorney's advice, he also insisted on putting his concerns regarding outrageous government conduct on the record. In any event, Defendant points to no prejudice he suffered by failing to testify. In essence, if permitted to testify, he states that he would have corroborated the government's allegations that he was drug dealing while acting as an informant, but he would deny that those activities extended to Rutland. Defendant's status as a convicted felon on drug charges, and the testimony of numerous witnesses to the contrary, may have undermined the jury's willingness to consider this claim credible.

On balance, individually and collectively, Defendant's proffered evidence fails to establish that Attorney Kinsella provided ineffective assistance at counsel at trial or that his representation in anyway prejudiced the outcome. To the contrary, Attorney Kinsella appeared engaged and well-prepared in presenting a consistent defense that there were other sources of supply for the Rutland conspiracy and that Defendant's involvement in that conspiracy could not be proven except through the testimony of cooperating witnesses who possessed a strong incentive to testify consistent with the government's objectives. Although Defendant points to a number of trial decisions that could have been made differently, his arguments and evidence do not give rise to "a real concern that an innocent person may have been convicted" so that the "interest of justice" requires a new trial. *Sanchez*, 969 F.2d at 1414. The court thus denies Defendant's request for a new trial on the basis of ineffective assistance of counsel.

## 2. Newly Discovered Evidence.

A Rule 33 "motion for a new trial based upon previously-undiscovered evidence is ordinarily 'not favored and should be granted only with great caution.'" *United States v. Stofsky*, 527 F.2d 237, 243 (2d Cir.1975) (quoting *United States v. Costello*, 255 F.2d 876, 879 (2d Cir.1958)). Relief is justified under Rule 33 only if the newly-discovered evidence could not have been discovered, exercising due diligence, before or during trial, and that evidence "is so material and non-cumulative that its admission 'would probably

lead to an acquittal.'" *United States v. Siddiqi*, 959 F.2d 1167, 1173 (2d Cir.1992) (quoting *United States v. Alessi*, 638 F.2d 466, 479 (2d Cir.1980)).

If a defendant presents new evidence establishing perjury by a government trial witness, however, a more favorable standard may apply "depend[ing] on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury." *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir.1991). In particular, where the government knew or should have known about the perjury, the conviction must be set aside "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (quoting *Perkins v. LeFevre*, 691 F.2d 616, 619 (2d Cir.1982)). Reversal is "virtually automatic" in this instance. *Id.* (quoting *Stofsky*, 527 F.2d at 243). On the other hand, "[w]here the government was unaware of a witness' perjury . . . a new trial is warranted only if the testimony was material and 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most likely not have been convicted.'" *Id.* (quoting *Sanders v. Sullivan*, 863 F.2d 218, 226 (2d Cir.1988) (alteration in original)).

Here, there is no newly acquired evidence of innocence. Both Mr. Vegas and Mr. Grant disclaim under oath the evidence Defendant seeks to establish through their testimony. There is thus only an allegation, not evidence, that these witnesses perjured themselves at trial. Even if Defendant could establish their perjury, he could not further establish that the government was aware of their perjury or that their testimony was material. Each witness testified at trial to facts that were corroborated by other witnesses. Accordingly, at best, the trial testimony was of Mr. Rivas and Mr. Grant was cumulative. Defendant has failed to establish that the alleged newly discovered evidence "is so material and non-cumulative that its admission 'would probably lead to an acquittal.'" *Siddiqi*, 959 F.2d at 1173. Even when considered in conjunction with Defendant's ineffective assistance of counsel claims, the court must DENY the request for a new trial, finding that Fed. R. Crim. P. 33(a) does not authorize that relief in the facts and circumstances in this case.

**B. Defendant's Motion for Acquittal.**

A defendant challenging the sufficiency of the evidence supporting his conviction bears a "very heavy" burden. *See United States v. Bicaksiz*, 194 F.3d 390, 398 (2d Cir. 1999); *United States v. Marji*, 158 F.3d 60, 63 (2d Cir. 1998) (per curiam); *United States v. Russo*, 74 F.3d 1383, 1395 (2d Cir. 1996). The jury's verdict must be sustained if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In applying this standard, a reviewing court "must assess the evidence in the light most favorable to the government," *United States v. Berger*, 224 F.3d 107, 116 (2d Cir. 2000), "credit[] every inference that the jury might have drawn in favor of the government," *United States v. Walker*, 191 F.3d 326, 333 (2d Cir. 1999), "resolve all . . . issues of credibility in favor of the [guilty] verdict," *United States v. Howard*, 214 F.3d 361, 363 (2d Cir. 2000), and "consider the evidence in its totality, not in isolation," *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).

"In order to convict a defendant of conspiracy, the government must prove both the existence of the conspiracy alleged and the defendant's membership in it beyond a reasonable doubt." *United States v. Chavez*, 549 F.3d 119, 125 (2d Cir. 2008). If there is proof that the defendant knew the general nature and extent of the illegal agreement, the government need not further prove that the defendant knew all of the details of the conspiracy, *United States v. Rosa*, 17 F.3d 1531, 1543 (2d Cir. 1994), or that he knew the identities of the other conspirators, *United States v. Downing*, 297 F.3d 52, 57 (2d Cir. 2002).

A conspirator is responsible for quantities of drugs sold by co-conspirators to the extent that such quantities were reasonably foreseeable as part of the conspiracy's intended objectives. *See United States v. Martinez*, 987 F.2d 920, 926 (2d Cir. 1993). In *United States v. Andino*, 627 F.3d 41 (2d Cir. 2010), the Second Circuit explained that the government need not present specific scienter evidence "when a defendant personally and directly participates in a drug transaction underlying a conspiracy charge." *Id.* at 47. With regard to drug transactions in which the co-conspirator did not personally and

directly participate, the government must establish that the particular quantity alleged in the conspiracy was reasonably foreseeable to the co-conspirator defendant. *Id.* at 46-47 & n.3.

Defendant argues that the verdict is not supported by sufficient evidence without describing in any detail the deficiencies in proof. The evidence at trial was extensive,[10] and examining it in the light most favorable to the government, it fully corroborated the government's claim that from approximately spring 2006 to summer 2009, Defendant and his co-conspirators in Schenectady delivered numerous kilograms of cocaine (well in excess of 5000 grams) as well as over 100 kilograms of marijuana to their Rutland based co-conspirators for resale. Based on the foregoing evidence, as well as the other evidence introduced at trial, a rational jury could have found beyond a reasonable doubt that as charged in Count 1 of the indictment, Defendant conspired to distribute 5000 grams or more of cocaine and 100 kilograms or more of marijuana. Defendant's motion for judgment of acquittal is therefore DENIED.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this _30th_ day of August, 2012.

Christina Reiss, Chief Judge
United States District Court

---

[10] The government accurately describes the trial evidence at some length in his opposition.